## THE AMERICAN INSURANCE COMPANY *vs.* CENTER.

In case of a technical total loss of a vessel insured, if no freight *pro rata itineris* has been earned or if the expense of sending on the cargo by another vessel will exceed a *moiety* of the freight agreed upon by the charter party, it is a *technical total loss of the freight* which will authorise the assured to abandon : a technical total loss of the vessel involves a loss of the freight.

A vessel injured by a peril of the sea cannot be abandoned merely because materials to make *full repairs* cannot be procured at the place where she happens to be; if the vessel is not injured to a moiety of her value, it is the duty of the master to make her sea-worthy and to proceed on the voyage, and the underwriter will be bound to furnish a complete indemnity for any additional expense subsequently incurred in completing the repairs.

In making an estimate of the probable expense of the repair of a vessel so as to ascertain whether the injury sustained will authorize an abandonment, the expense is to be estimated with reference to the cost of repairs at the port of necessity ; if, however, full repairs cannot be made there, but the vessel can be repaired in part so as to render her sea-worthy and enable her to pursue her voyage, then to the probable expense at the port of necessity it is proper to add the expense of the additional repairs at the place where the vessel would most probably be repaired in full.

The master is not authorized to sell the ship or cargo except in a case of absolute necessity, where he is not in a situation to consult with his owner, and where the preservation of the property makes it necessary for him to act as the agent of whom it may concern.

ALBANY,
Dec. 1829.

American Ins.
Company.
v.
Center.

In England it is held that it is the duty of the master to repair the vessel un-
less there be an actual total loss, or he has no means of repairing and can-
not procure any by the hypothecation of the ship or cargo. In this country
the right of the master to sell is more extensive ; if there be a technical
total loss, and the master has reason to believe that his owner will elect
to abandon, he is under no obligation to repair, but may sell the vessel,
and such sale does not take away the right of abandonment, nor convert a
total into a partial loss.

A ship owner, entitled to abandon the vessel by reason of the extent of inju-
ry received by her from the perils insured against, cannot be required by
a shipper of the cargo to repair for the purpose of sending on the cargo ;
he can only be required to send it on if another vessel can be procured.

It seems that where a cargo is sent on by another vessel for the benefit
of salvage on the freight, the underwriter on the freight is bound to pay
the expense of the transhipment, and the owner or underwriter on the
cargo is only chargeable with the extra expense beyond the amount of
freight as fixed in the original charter party.

Whether shippers have a right to demand a return of the goods without pay-
ing freight, where a vessel meets with a disaster on the day after sailing
and returns to her port of departure to repair. Quere:

ERROR from the supreme court. Center sued the Amer-
ican Insurance Company on a policy of insurance on the
*freight* of the ship Pallas on a voyage from New-Orleans to
Havre. The same company had also insured the ship which
was valued at $10,000; the freight was valued at $6000.
On the 22d November, 1824, the ship sailed from New-Or-
leans with a full cargo of cotton on board, the freight of
which, if earned, would have amounted to $7627,37. On
the next day after leaving port she struck upon the spit, a
little to the northward of the bar, at the mouth of the river
Mississippi, and was so much damaged as to render it neces-
sary that she should return to New-Orleans for repairs.
Her cargo was discharged and her keel hove over to ascer-
tain the extent of damage she had received. A survey was
had by the port-wardens assisted by three ship-masters and
a ship-carpenter, associated with the wardens at the request
of the agent of the insurance companies of New-York resi-
dent at New-Orleans, who, however, at the time was unap-
prized that an insurance had been effected. The wardens
and the others concurred in the opinion that the expense of
repair would amount nearly to the full value of the ship, and
that it would be more to the interest of all concerned to
abandon and have her sold for whatever she might bring than

ALBANY,
Dec. 1829.

AmericanIns.
Company
v.
Center.

to put upon her the expenses necessary to place her in a sea-worthy condition. Information of the result of the survey was immediately communicated to the assured at New-York, who, on the 21st January, 1825, abandoned ship and freight to the underwriters. On the 17th January, 1825, the ship was sold at public vendue, under the direction of the wardens of the port, for the sum of $2,800. The Pallas was coppered, and her copper was very much injured by the damage she had sustained. None could be obtained at New-Orleans to repair her; and the shippers were unwilling to have the cotton go on in her upon her being sheathed with wood instead of copper, having ordered insurance on the cotton in a coppered vessel. The cargo, therefore, was delivered back to the shippers, who paid nearly $1,800 as their share of the general average. During the trial of the cause upon the vessel policy it was agreed by the counsel of the parties that the same jury should pass upon this cause; and the jury having afterwards given a verdict in the former cause in favor of the plaintiff, an agreement in writing was entered into by the counsel to the following effect: that the jury should find a general verdict, subject to the opinion of the court, upon a case in which the following facts should be inserted as found by the jury; 1. That the vessel could not have been repaired at New-Orleans by re-coppering her; 2. That if copper had been procurable at New-Orleans at its usual price, the expenses of repairing the vessel fully at that port would have exceeded a moiety of her value in the policy, making the usual deductions; 3. That the vessel might have been repaired at New-Orleans, sheathing her with wood, so as to render her sea-worthy and competent to perform the voyage to Havre with a full cargo at an expense less than such moiety; and 4. That the expense of re-coppering the vessel at Havre or New-York, added to the expense of repairing and sheathing her with wood at New-Orleans, would have exceeded a moiety of the valuation in the policy, making the usual deductions.

The judge presiding at the trial charged the jury that the evidence was sufficient to entitle the plaintiff to recover as for a total loss. The defendants excepted, and the jury

found for the plaintiff. The defendants moved for a new trial on the bill of exceptions, which was denied by the supreme court, and judgment given for the plaintiff. (For the reasons of the supreme court see 7 Cowen, 564.) The defendants sued out their writ of error.

The cause was argued in this court by

*O. Hoffman & J. Duer*, for the plaintiffs in error ; by

*P. A. Jay & G. Griffin*, for the defendants in error.

The following points were made on the part of the plaintiffs in error :

1. That there was not a constructive total loss of the vessel, and consequently, a total loss of the freight cannot be claimed.

2. That the abandonment cannot be sustained on the sole ground that the vessel could not be fully repaired at the port of disaster.

3. That the assured is in no case entitled to abandon for sea damage, when the vessel is capable of being repaired, so as to prosecute her voyage, at an expense less than half her value.

4. That on the supposition of a constructive total loss of the vessel, the right to abandon was divested by the unnecessary sale of the vessel, by the agents of the assured, at New-Orleans.

5. That the total loss of the vessel does not draw after it, as a necessary consequence, a total loss of the freight.

6. That the true construction of the freight policy is, that the assured shall be indemnified, if by the perils insured against he shall be prevented from earning his freight, under the contract between him and the shipper.

7. That, consequently, a total loss of the freight can never be claimed, unless the assured, by the perils insured against, has been discharged from his obligation to the shipper to perform the voyage.

8. That in the present case, the contract between the shipper and the assured was not discharged by the perils insured against, and, under the circumstances, it was the duty of the

master, by repairing his vessel or procuring a new one, to have earned the stipulated freight.

ALBANY,
Dec. 1829.

American Ins.
Company
v.
Center.

9. That in any view of the case, judgment ought not to have been rendered for the whole amount claimed, as the defendants were entitled to a deduction of what might have been saved by a transhipment of the goods.

The following points were made on the part of the defendant in error:

1. There was a constructive total loss of the vessel.

2. The right to claim for such total loss was not impaired by the sale of the vessel at New-Orleans.

3. The total loss of the vessel involved a total loss of the freight.

4. Had the assured proceeded to repair the vessel as well as she could have been repaired at New-Orleans, the shippers of the cargo had, under the circumstances of the case, *a right to refuse*, and *did refuse* to permit the cargo to be reshipped therein.

5. By the abandonment of the vessel to the defendants, it ceased, from the time of the disaster, to be the property of the plaintiff, and of course he had no right to the subsequent use of the vessel.

6. The plaintiff could not have procured another vessel to transport the cargo to the port of its destination for a moiety of the freight as valued in the policy.

The cause having been very fully argued when in the supreme court, by G. Griffin and Thomas Addis Emmet for the assured, and by J. Duer and D. B. Ogden for the assurers, the reporter begs leave to refer to the reader to the report of the arguments of counsel in that court, to be found in 7 Cowen, 569 to 579, as embracing a general view of the arguments and cases relied on by the counsel in this court.

The following opinions were delivered.

By the CHANCELLOR. This is an action upon a policy on the *freight* of the ship Pallas, on a voyage from New-Orleans to Havre, and the right of the plaintiff to recover for a total loss depends upon the question whether there was a valid abandonment to the underwriters upon the policy on the

*ship.* I shall therefore proceed, in the first place, to examine that question.

From whatever source the principle was derived, it is now well settled in this country that the assured may abandon for a total loss whenever the ship is injured, by the perils insured against, to a *moiety* of her value. But there has been some diversity of opinion as to the mode of applying the principle to particular cases. On the trial of the suit on the ship policy, it was insisted, on the part of the underwriters, that in determining the question of technical total loss, the assured was bound by the valuation in the policy; and that he had no right to abandon unless the expenses of repairs, after making the usual deduction, would exceed a moiety of the value as thus fixed. Having at that time a very imperfect knowledge of insurance law, I* decided that question against the underwriter, on the authority of *Peel* v. *The Merchant's Ins. Co.*, (3 Mason's Rep. 27,) which case had then been published only in pamphlet form. As the counsel for the assured were not willing to risk their cause upon Judge Story's opinion on this point, they waived the benefit of my decision in their favor, before the cause went to the jury. Although this question was afterwards argued before the supreme court, it does not properly arise upon the bill of exceptions in this case; and I merely notice it here for the purpose of saying that the doubts I entertained as to the correctness of my decision on this question at the trial have not been weakened by subsequent investigation and reflection. The extent of the injury is to be calculated with reference to the value of the ship before the disaster. Hence the application of the principle of deducting one third from the estimated expense of full repairs, for the purpose of ascertaining whether she is injured to a moiety of her value.

For the purposes of this suit, the value of the ship at the time of the disaster is fixed at $10,000, as estimated in the policy. It is also found by the jury that the expense of full repairs of the ship at New-Orleans, including copper at its usual price at that place, would have exceeded a moiety of

---

* This cause was tried at the New-York circuit in April, 1826, before the Chancellor, he then being one of the circuit judges of the state.

that sum, after making the usual deduction of one third. But full repairs could not have been made at that port, because no suitable copper was to be had.

The counsel for the assured suppose this was a sufficient cause of abandonment, although the ship was not injured to a moiety of her value. I know of no principle which can authorize the abandonment of a vessel, either in port or elsewhere, merely because materials cannot be had there to make full repairs. If the ship is not injured to a moiety of her value, it is the duty of the master to make her seaworthy and to proceed on the voyage ; and if the assured completes the repairs afterwards, the underwriter must pay the additional expense, so as to furnish a complete indemnity.

On the other hand, it is contended that the master is bound to make the ship seaworthy and proceed on his voyage, if full repairs cannot be made at the port of necessity, although injured to *more* than a moiety. This, also, is following a technical rule beyond the reason on which it is founded. The rule is, that the repairs must be estimated at the port of necessity. But the rights of the parties are not to be sacrificed to this technical rule, if for any cause it is impossible to make full repairs there. As that is the natural and proper place to make full repairs, the expense is to be estimated with reference to the prices at that place, whether they are high or low ; but if repairs cannot be made there, so as to restore the subject insured to its former state, it will then be necessary to inquire where the additional repairs would naturally be made, and to add the expense of such at that place to the amount of those which could be made at the port of necessity. If the master had decided to repair in this case, what would have been his natural course ? As he could not re-copper at New-Orleans, the ship would have been rendered seaworthy for the voyage by wooden sheathing of a proper thickness to receive the copper afterwards ; and there being no copper fastenings at that place, iron fastenings must from necessity be used. After the cargo was discharged at Havre, copper fastenings and copper sheathing would be added to complete the repairs ; and an estimate of the aggregate amount of making the repairs in that manner would be the proper criterion for determining whether the ship was injur-

ed in such a manner as to authorize an abandonment; in other words, whether she was worth repairing in that manner. From the facts found by the jury, there was a total loss of the ship, viewing the case in the most favorable light for the underwriters.

The right to abandon having once existed, did the assured lose that right by the sale of the ship? The master is not authorized to sell the ship or cargo, except in a case of absolute necessity, when he is not in a situation to consult with his owner, and when the preservation of the property makes it necessary for him to act as the agent of whom it may concern. I think, with the counsel for the underwriters, that the rule of a technical total loss of the ship, if injured to a moiety of the value, has never been acted on in England. The recent cases show pretty clearly that no such rule exists there; and it is necessary to bear this in mind in examining the English cases as to the right of the master to sell. It is there the duty of the master to repair the vessel unless there is an actual total loss, or he has no means of repairing, and cannot procure any by the hypothecation of the ship or cargo. (*Idle* v. *The Royal Exc. Ass. Co.* 7 Taunt. 755. 4 Dow. & Ry. 210, note. *Read* v. *Bonham*, 6 J. B. Moore, 397. *Meaburn* v. *Leckie*, 4 Dow. & Ry. 207. *Robertson* v. *Clark*, 1 Bing. 445. *Cambridge* v. *Anderson*, 4 Dow. & Ry. 203.) In these cases the question was not whether a sale by the master deprived the assured of a right to abandon which previously existed, but whether the sale was absolutely necessary so as to constitute a total loss. And the more recent decision shew that no abandonment is necessary in those cases, where the ship has been properly sold by the master.

In this country the right of the master to sell must necessarily be more extensive. If there is a technical total loss, and he has reason to believe that his owner will elect to abandon, he is under no obligation to repair where it is not for the interest of the owner to do so. The underwriter cannot require any thing of the master which could not be required of the assured himself, if he were on the spot. If the assured had been at New-Orleans at the time of the dis-

ALBANY,
Dec. 1829.

American Ins.
Company
v.
Center.

aster, and had sent on a notice of abandonment to the underwriters, it would still have been his duty to preserve the property for the benefit of salvage. Probably it would have been his duty to do precisely what was done by the master. If the ship was properly abandoned to the underwriters, it was for their interest that a sale should be made without delay. There is no complaint in this case that the ship did not sell for ‚its full value. Although the general agent had no authority to accept an abandonment, or to bind the insurers, he was appointed to see to their interests generally. He was constantly consulted by the master, was present at the sale, and was perfectly satisfied that all the proceedings were fair and honest, for the benefit of whoever it might concern. A sale thus made would not create a total loss so as to give a right to abandon; but I think it did not take away the right of abandonment, and make a partial loss of that which the assured had a right to treat as total.

Under a general policy of insurance the ship owner can have no right to abandon which is inconsistent with his general duty to the owner of the cargo. If he has a right to abandon the ship when it is injured to a certain extent, the shipper cannot require him to repair for the purpose of sending on the cargo. He can only be required to send it on if another vessel can be procured. A technical total loss of the vessel involves a loss of the freight. By the abandonment of the vessel she is no longer in a situation to earn freight for the assured. The underwriters are under no obligation to carry on the cargo; and if they do they will be entitled to all the freight subsequently earned. The insurance on freight is an agreement that the perils insured against shall not prevent the ship from earning full freight for the assured on that voyage. If the ship is totally lost, or rightfully abandoned before the voyage is completed she cannot earn full freight, and the underwriter is bound to indemnify the assured for the loss which he has sustained. If no freight *pro rata itineris* has been earned, or the expense of sending on the cargo by another vessel is equal to, or exceeds the whole amount of freight agreed upon by the charter party; or if no other conveyance can be had at the port of necessity,

and the owner refuses to receive the goods, there is an abso-
lute total loss of the freight, and no abandonment is necessary,
because there is nothing left to abandon. (12 Johns. R. 107.)

If the expense of sending on the cargo by another vessel
will exceed a moiety of the freight, it is a technical total loss
of the freight which will authorize the assured to abandon.
But the only benefit of an abandonment in such a case is to
throw the risk and expense of collection and other inciden-
tal expenses upon the underwriter; and to entitle the owner
of the freight to recover the whole amount insured without
delay.

If freight *pro rata itineris* has been earned, it is the duty of
the master to receive such freight from the owner of the car-
go, or to send on the goods for the benefit of the salvage on
the freight. Where there has been no abandonment of the
freight, the amount of salvage lost by the neglect of the mas-
ter to send on the goods must fall upon the assured.

The counsel for the plaintiffs in error supposed the under-
writer on the freight was not answerable for the expense of
sending on the cargo in another vessel; but I apprehend
there can be no doubt on that point. It may be the duty of
the master to send on the goods for the purpose of saving the
cargo as well as the freight. When they are sent on for the
benefit of salvage on the freight, the underwriters on that are
bound to pay the expense of the transhipment: (Benecke on
Ind. 449.) And the owner, or underwriter on the cargo, is
only chargeable with the extra expense beyond the amount
of freight as fixed in the original charter party. (*Searle &
Adams* v. *Scovell*, 4 Johns. Ch. R. 218.)

In this case the vessel was totally lost and gone from the
owner of the freight by a rightful abandonment. The car-
go was returned to the shippers at the port of lading, and no
freight *pro rata itineris* had been earned. A small saving
might have been made in the expense of compressing the
cargo; but that was hardly sufficient to compensate the un-
derwriters for the risk and expense of collecting the freight,
if the cargo had arrived at the port of destination. I have
doubts as to the right of the shippers to demand a return of
the goods without paying freight. But as they were willing

to receive the cargo, I think the master acted properly and with a view to the interest of all concerned in not sending it on by other vessels.

My opinion is, that there was a total loss of the freight, for which the underwriters are answerable; and that the judgment of the supreme court should be affirmed, with the usual damages and costs.

By Mr. Senator S. ALLEN. The plaintiffs in error insist that there was not a constructive total loss of the vessel, and that therefore a total loss of the freight cannot be claimed.

The numerous decisions, on nearly similar cases to the present which have occurred in our courts, it appears to me, will warrant the following summary:

If a ship is injured by any of the perils insured against, so that she will cost more than half her value to place her in as good order and condition as she was in when the policy commenced to operate, she may be abandoned to the underwriters, and the assured may recover for a total loss. That the value in the' policy, in general, is a good criterion by which to judge of the value of the ship, and the expense of repairs at the port where she has taken shelter is the rule by which to determine the amount of injury received, and the estimate must be such as will fully reinstate the vessel with the same or equally as good materials as she was composed of at the time of the disaster. On the subject of repairs one third new for old, there appears to have been opposing opinions; the case *Depuy* v. *United Ins. Co.* (3 Johns. C. 182,) on one side, and *Dunham* v. *Com. Ins. Co.* (11 Johns. R. 315,) on the other; but, in my view, the deduction of one third new for old will hardly apply to cases of abandonment for a total loss, as the assured in such case receives none of the benefits intended by the rule. Where a partial loss occurs and the vessel is repaired, the benefit of new for old goes to the assured, and having received his vessel in her improved condition, it is but right he should make the allowance; but not so when the property goes out of his possession by abandonment; he then receives only the net value specified in the

policy, which is presumed to be but a moderate valuation of the vessel at the time of commencing the voyage.

Chief Justice Parsons considers damage to the ship, exceeding half her value, to be a constructive shipwreck. The ship becomes a wreck when she is rendered unable to pursue the voyage without repairs exceeding half her value. (Phil. on Ins. 401.)

By the documents furnished as evidence in this case, it seems that great pains were taken to ascertain the damage which the ship had sustained. The wardens of the port state it at $7000 exclusive of the ship chandler's bill, and by an exhibit of the whole expense of repairs, &c. it is made to amount to $7723,17. The value of the vessel in the policy was $10,000, and in the opinion of several of the witnesses on the trial, this is the amount at which she would be valued at New-York; while at New-Orleans, she would not bring, after being repaired, more than seven or eight thousand dollars. By a stipulation agreed upon by the parties, it is admitted that to copper the bottom at New-Orleans, if copper had been procurable at its usual price, the repairs would have exceeded a moiety of her value, and that the expense of re-coppering the vessel at Havre or New-York, added to the sheathing with wood at New-Orleans, would have exceeded a moiety of the value in the policy. The fact, then, that the vessel would have cost more than half her value, if properly repaired at the port of necessity, is clearly made out and admitted ; and if it was proper that she should have been so repaired, then it is also proper that the assured should recover of the underwriters for a total loss.

It was strongly urged by the counsel for the plaintiffs in error that if the vessel could be so repaired as to enable her to perform the voyage, the assured had no right to abandon ; and that she might have been repaired at New-Orleans by sheathing her with wood instead of copper, so as to perform the voyage to Havre in safety.

If this rule is to be adopted, it appears to me that insurance, as a contract of indemnity, would be nothing but a name. In the present case, the vessel insured was sheathed with

copper, and the copper was so much injured, by a peril insured against, as to render it useless, and make it necessary that it should be taken off and replaced with other copper. Now, if it was competent to the underwriters to sheath the vessel with wood instead of copper, upon the same principle they might have sent her on her voyage without sheathing, if, by new caulking the seams in her bottom, she could have been made sufficiently tight to reach her port of destination; and so if a vessel be injured in any other respect, by the perils insured against, such injury may be repaired with an article greatly inferior in value to that which was lost. This, in my opinion, is neither consonant with law or reason, and therefore, as the vessel could not be repaired at New-Orleans, so as to place her in the situation in which she was before the disaster, for less than half her value, I am of opinion that the abandonment to the underwriters was legal, and the judgment of the court correct.

The total loss of the vessel, say the plaintiffs in error, does not draw after it, as a necessary consequence, a total loss of the freight. The insurance on freight was $6000, and the estimated amount on the cargo, if the vessel had arrived at the port of destination, was $7627,37. The vessel had commenced the earning of this freight by proceeding on her voyage to the place of disaster. In the case of *Davy* v. *Hallet*, (3 Caines, 16,) it was held that on a valued policy on freight, if, at the time of a total loss, there is an inchoate right to freight, the assured is entitled to recover the whole amount of the valuation, which is to be adhered to if the case be fair and honest between the parties. The reasonableness of this decision must be admitted, especially when applied to the present case. The policy professes to indemnify the assured against every loss and misfortune whereby the freight, or any part thereof, shall be lost.

That there was a total loss of freight, in consequence of the disaster to the ship and the breaking up of the voyage, cannot be disputed. It was urged, however, that it was the duty of the captain to have procured another vessel to carry the cargo to its port of destination, and several cases were

ALBANY,
Dec. 1829.

American In.
Company
v.
Center.

referred to as authority; but I am unable to perceive the analogy between the cases alluded to and the one under consideration. In the present case the injury was so great that it could not be repaired, while in those cited the injury was trifling and the vessel in safety. The property was out of the control of its owners and in a foreign port, while here it was given up to the shippers, who sent it on themselves to its port of destination. The propriety of delivering the property to its owners must be apparent from the testimony of Mr. Russell in this particular : he states, that before it was ascertained that the ship would be condemned, he had found that copper could not be had at New-Orleans, and he enquired of the shippers of the cotton, therefore, whether, in case the ship was repaired, and sheathed with wood instead of copper, they would have any objections to let the cotton go in her; to which they replied, that having ordered insurance on the cotton in a coppered vessel, they would not dare to give their consent that the cotton should proceed in a vessel not coppered, as they might endanger their insurance.

I am clearly of opinion, therefore, from the best consideration I have been able to bestow on the subject, that the judgment of the court below was correct, and ought to be in all things confirmed.

And this being the unanimous opinion of the court, the judgment of the supreme court was thereupon affirmed with costs.